```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF PUERTO RICO
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MANSIO VICENTE-LUCAS,<br><br>Defendant. | CRIM. NO. 11-132(PG) |

**OPINION & ORDER**

Pending disposition by this Court is defendant Mansio Vicente-Lucas' (hereinafter "Vicente-Lucas") Motion to Suppress. Docket No. 28. Vicente-Lucas moves to suppress all of the evidence seized as a result of a warrantless search effectuated on his vehicle by Puerto Rico Police Department (PRPD) officers on the evening of April 7, 2011. The United States opposed his request (Docket No. 29). Upon careful review of the parties' filings as well as the evidence presented at the suppression hearing, the Court **DENIES** Vicente-Lucas' Motion.

## I.   Findings of Fact

The Court, after having opportunity to examine the testimony proffered at the suppression hearing by PRPD Officer Jorge Dávila-Barrios, taking into account the witness' demeanor, credibility and appearance, makes the following findings of fact.

During the evening of April 7, 2011, PRPD Officers Jorge Luis Dávila-Barrios and Juan Alvarado were on patrol along Puerto Rico Highway No. 52 North, near the exit to the town of Salinas. At approximately 8:30 pm they observed Vicente-Lucas' vehicle, a dark green Jeep Wrangler, driving on the left lane of said highway, at what they thought was a relatively low rate of speed. The Officers clocked his speed at 38 mph via the use of a radar gun, which would have meant he was violating section 5.03(a) of the Puerto Rico Vehicles and Transit Act, Act. No 22 of January 7, 2000, P.R. LAWS ANN. tit. 9, § 5123 (Law 22), as the section

of the Highway in which he was traveling had a posted speed limit of 65 mph.[1]

After gauging Vicente-Lucas' speed, Officer Dávila-Barrios drove his patrol car alongside Vicente-Lucas' until both were parallel to each other. Officer Dávila-Barrios then observed that Vicente-Lucas' vehicle had dark tinted windows, and testified that he could not see the occupants of the vehicle nor the dashboard lighting inside.[2] In Puerto Rico, the altering of a motor vehicle's windows with tints or other materials that produce a percentage of transmission of visible light that is less than 35 per cent is illegal. See § 10.05 of Law 22, P.R. LAWS ANN. tit. 9, § 5285. Having observed that Vicente-Lucas was possibly in violation of both sections 5.03 and 10.05 of Law 22, Officer Dávila-Barrios engaged his lights and siren and ordered Vicente Lucas to pull over his vehicle unto the hard shoulder lane. Officer Dávila-Barrios then followed Vicente Lucas' vehicle and parked his patrol car about five or six feet behind, in an area under several lamp posts.

Officer Dávila-Barrios approached the vehicle and noticed that the driver's window was open, allowing him to see the driver (Vicente-Lucas) and his front passenger, Josué Díaz-Bermúdez, the other co-defendant in this case (hereinafter "Díaz-Bermúdez"). Officer Alvarado also approached the vehicle along its passenger side, in order to provide cover for his partner. Officer Dávila-Barrios testified that at that point he was not able to determine whether there were any more occupants in the backseat of the vehicle, due to the tinting of the rear windows. He then informed Vicente-Lucas of his traffic violations and ordered him to produce his

---

[1] Said disposition states that "[i]t shall be illegal for any person to drive a vehicle or motor vehicle on any public highway at a speed of less than twenty (20) miles under the established maximum speed limit. This provision does not apply when safe driving requires reduced speed, or on a hill, or when driving a heavy motor vehicle which of necessity or in compliance with the law is driven at a slow speed. An infraction of this provision shall be punished as an administrative fault, with a fine of fifty dollars ($50)." Defendants at the suppression hearing did not argue that any of the exceptions to the statute were applicable.

[2] Officer Dávila-Barrios testified that all of the windows of the vehicle were tinted.

driver's license and registration. Vicente-Lucas turned on a light inside his vehicle and started to search for the documents. As he handed over his documents, Officer Dávila-Barrios was able to observe the front part of a weapon protruding from underneath Vicente-Lucas' seat. About 12 inches of the front-end of the weapon were visible to Officer Dávila-Barrios.

Officer Dávila-Barrios immediately ordered Vicente Lucas to exit the vehicle and then proceeded to seize the weapon, which turned out to be a fully loaded Carbon-15 Pistol Caliber 5.56 NATO.[3] The weapon also had an additional magazine attached to it. Upon occupying it, Officer Dávila-Barrios unloaded it and instructed Vicente-Lucas to move over next to his patrol car. He also instructed Officer Alvarado to arrest passenger Díaz-Bermúdez. Officer Dávila-Barrios then proceeded to arrest Vicente-Lucas while reading him his rights under *Miranda*. During his arrest, Vicente-Lucas was standing alongside the patrol car, about five feet from the detained vehicle.

Once Vicente-Lucas was placed under arrest, he told Officer Dávila-Barrios that he had a permit to carry firearms. Vicente-Lucas told the Officer that the permit was in his waist pouch, and the Officer proceeded to inspect it with Vicente-Lucas' permission. However, despite the seemingly valid license, at that point Officer Dávila-Barrios still believed that Vicente-Lucas was in violation of the Puerto Rico Arms Act, Act. No. 404 of September 11, 2000, P.R. LAWS ANN. tit. 25, § 455, *et seq.* (the "Arms Act"). Section 2.02(d)(1) of the Arms Act confers licensees the right to possess, bear and transport firearms, provided that they be "borne, carried, and transported in a hidden and unobtrusive manner…" P.R. LAWS ANN. tit. 25, § 456a(d)(1). Section 1.02(x) defines the transportation of a firearm as:

> the mediate or immediate possession of a weapon for the purpose of taking it from one place to another. Said transportation must be carried out by a person with a current weapons license and the

---

[3] Officer Dávila-Barrios testified that it was a "long" firearm, about two feet long, which also contained "long" magazines.

> weapon <u>must be unloaded and transported inside a closed case whose contents are not visible and which may not be in plain sight</u>. P.R. LAWS ANN. tit. 25, § 455(x) (our emphasis).

Officer Dávila-Barrios testified that, at the time he arrested Vicente-Lucas, he believed Vicente-Lucas was in violation of the referenced dispositions of the Arms Act, as Vicente-Lucas' weapon was loaded, in plain sight and not in a holster.

As this was transpiring, Officer Alvarado had already placed Díaz-Bermúdez under arrest and had sat him down on the guardrail bordering the road, as Díaz-Bermúdez was limping and using crutches. The guardrail was an estimated two to three feet from Vicente-Lucas' vehicle.

Officer Dávila-Barrios then asked Vicente-Lucas whether he had any additional firearms "or anything else" in the car. Vicente-Lucas replied that he had another weapon in his vehicle which was unloaded and rested inside a black bag on the backseat. Officer Dávila-Barrios proceeded to move Vicente-Lucas right next to his partner and Díaz-Bermúdez. Then, as he began to search inside a black bag situated on the back seat which he thought contained the weapon, he found an inordinate amount of small yellow bags, containing what he believed to be, from his experience as a police officer, crack. He also found several blue bags as well as two transparent bags containing a white powder, which from his experience he understood to be cocaine. Vicente-Lucas allegedly told Officer Dávila-Barrios that he did not know what those materials were and that they were there because he had given his passenger a lift. Officer Dávila-Barrios then took the bag to the patrol car and again asked Vicente-Lucas about the location of the second firearm. He again replied that the weapon was in the backseat of the car.

Officer Dávila-Barrios, this time opening the right rear door of the vehicle, was then able to find another black bag resting on the backseat. This bag contained an unloaded weapon along with three loaded magazines and a box containing an assortment of different bullet types.

The weapon in question turned out to be an FN Herstal Belgium handgun.[4] Officer Dávila-Barrios then secured this weapon and placed it in the patrol car. At this time both defendants were in close proximity (about two or three feet) to the right rear door of Vicente-Lucas' vehicle.

Officers Dávila-Barrios and Alvarado then proceeded to pat down defendants Vicente-Lucas and Díaz-Bermúdez, respectively, with Officer Alvarado occupying a transparent bag with a white powder that he found on Díaz-Bermúdez's person.

Afterwards, Officer Dávila-Barrios placed Vicente-Lucas inside his patrol car, while Díaz-Bermúdez was placed in another patrol car that had just arrived on the scene with two additional agents, one of which was a shift supervisor. The Officers took custody of all the aforementioned evidence and transported the defendants to the PRPD Salinas Highway Division Station. Officer Alvarado was tasked with driving Vicente-Lucas' vehicle to the station, where he would rendezvous with the defendants and the other officers.

There, the vehicle's windows were tested to determine whether they were tinted in excess of the maximum limit prescribed by Law 22. They were.[5] Vicente-Lucas was then given two tickets for both traffic violations and an inventory search of the vehicle was carried out.[6] The search also revealed more drug paraphernalia, as well as electronic gear, plates, cards, a blender, spoons and baggies, all of which rested inside a blue bag located behind the driver's seat. Under the passenger seat, a radio similar to the ones used by the PRPD was also found.

In the end, as a result of this intervention, the seized evidence consisted of: (1) a Carbon-15 Pistol 5.56 Caliber NATO; (2) an FN Herstal

---

[4] Officer Dávila-Barrios testified that he believed the weapon to be a "cop killer," since it uses an ammunition type similar to the one used by rifles.

[5] A test carried out by Officer Alvarado revealed that the tints on Vicente-Lucas' vehicle were only allowing an eight per cent transmission of visible light, when § 10.05 of Law 22 establishes a minimum of 35 per cent.

[6] The officers performed a "P.P.R.-128" report on the vehicle, which is a report the PRPD makes of a seized vehicle when it's being investigated for felony violations.

Belgium handgun; (3) one extended 5.7 x 28 magazine; (4) two standard 5.7 x 28 magazines; (5) several 5.7 x 28, 7.62 x 39 and .45 caliber rounds; (6) seven hundred forty nine (749) baggies of crack cocaine; (7) seventy five (75) baggies of cocaine; and (8) various drug paraphernalia items including a scale, strainers, a blender, plastic baggies, razors, a plate and spoons among other things.

Based on the evidence, defendants Vicente-Lucas and Díaz-Bermúdez were charged with: (1) possession with intent to distribute controlled substances (cocaine), 21 U.S.C. § 841(a)(1), (b)(1)(c); (2) possession with intent to distribute controlled substances (cocaine base), 21 U.S.C. § 841(a)(1), (b)(1)(c); (3) possession of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). Docket No. 11.

Vicente-Lucas is now requesting the suppression of all of the aforementioned evidence, claiming that it is the product of an unreasonable warrantless search of his vehicle, in violation of the Fourth Amendment to the United States Constitution. Specifically, he claims that: (1) the traffic stop was not justified at its inception; and (2) that as they were already secured and under arrest at the time the search was effectuated, said search was illegal under the search incident to arrest doctrine, as modified in the recent Supreme Court case of Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710 (2009).

## II. Discussion

The Fourth Amendment to the U.S. Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." U.S. CONST. amend. IV.

This Constitutional prohibition against unreasonable searches and seizures applies to motor vehicles, South Dakota v. Opperman, 428 U.S. 364 (1976); Hoffa v. United States, 385 U.S. 293 (1966), including their interior. New York v. Class, 475 U.S. 106 (1986). When a search of a

motor vehicle is conducted without a warrant supported by probable cause, it is presumptively invalid, unless an exception to the warrant requirement applies. Gant, 129 S.Ct. at 1723-24. The Supreme Court has carved out a number of exceptions to searches and seizures in the vehicle context, including: (1) the search incident to arrest, Gant, supra; (2) the automobile exception, Carroll v. U.S., 267 U.S. 132 (1925); United States v. Ross, 456 U.S. 798, 820-21; (3) the community caretaking exception, Cady v. Dombrowski, 413 U.S. 433 (1973); and (4) the inventory search, Colorado v. Bertine, 479 U.S. 367 (1987), among others.

The Court believes that the search conducted in the instant case was reasonable and justified under several of the referenced exceptions. The Court begins, however, by discussing the legality of the traffic stop at its inception.

**A. The Violations of Puerto Rico's Traffic Laws**

Temporary detentions of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitute a "seizure" of "persons" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. See id. at 659.

In the instant case, the officers had observed Vicente-Lucas traveling in his vehicle at a speed of 38 mph, which is 27 mph less than the allowed maximum speed limit of 65 mph for the section of the highway in question. Officer Alvarado was able to clock the speed of the vehicle via the use of the patrol car's radar gun, thus allowing the officers to acquire probable cause that defendants were in violation of § 5.03(a) of Law 22 (traveling at more than 20 mph below the maximum allowed speed limit). The officers' suspicions were further aroused when they detected that Vicente-Lucas' vehicle sported dark tinted windows, which the

officers reasonably believed were over the legal limit, as they were not able to peer inside the vehicle to see its occupants. This by itself created a reasonable belief in the officers minds that the defendants were violating § 10.05 of Law 22 (establishing a limit on the amount of tints a vehicle's windows may have). The Court needs not go any further; it concludes that, based on the officers' observations, they had the requisite probable cause to stop Vicente-Lucas' vehicle for both violations of sections 5.03 and 10.05 of Law 22.

Once the officers had signaled Vicente-Lucas to pull over for these violations, Officer Dávila-Barrios was able to observe that Vicente-Lucas was carrying a weapon in plain view under his seat. It is well settled that a police officer's observation of an item in plain view does not constitute a search so long as the officer makes his observation from a lawful vantage point. Spencer v. Roche, ---F.3d----, 2011 WL 4916925, at *6 (1st Cir. Oct. 18, 2011). Here, Officer Dávila-Barrios was legitimately positioned right next to the vehicle's window following a lawful traffic stop. From this vantage point, he was able to observe about 12 inches of the front part of a weapon protruding from under the driver's seat. As a safety precaution, he ordered Vicente-Lucas to exit the vehicle and proceeded to unload the weapon. Subsequently, he lawfully placed Vicente-Lucas under arrest as the weapon in question was loaded and in plain view, in violation of the Puerto Rico Arms Act.

So far, Vicente-Lucas' arrest and the seizure of his first weapon were within the limits of the Fourth Amendment. However, as soon as Vicente-Lucas produced his license to carry firearms, defendants argue, the officers were required to stop any further search of his vehicle and release him. The subsequent search to recover Vicente-Lucas' second weapon from the backseat of the vehicle, their argument goes, was therefore invalid and a violation of Vicente-Lucas' Fourth Amendment rights. For the reasons outlined below, the Court is unconvinced. The Court believes that the search in question was reasonable under the circumstances, and justified under several of the exceptions to the

warrant requirement for vehicle searches, namely: (i) the search incident to arrest exception; (ii) the automobile exception; and (iii) the community caretaking doctrine. The Court will explain below.

**B. The Ensuing Search of the Vehicle**

    i.   **The Search Incident to Arrest Doctrine**

When conducted incident to a lawful custodial arrest, a full search of the arrestee's person for both weapons and evidence is permitted. United States v. Robinson, 414 U.S. 218, 235 (1973). Gant has clarified that a vehicle search may fall within the search-incident-to-arrest doctrine only in two very specific situations: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" (the officer-safety justification); or (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" (the evidence-preservation justification). Gant, supra at 1719 (internal citations and quotations omitted).

Vicente-Lucas argues that the first scenario is not met as Díaz–Bermúdez and he were already placed under arrest and secured at the time the search was carried out by the officers. The Court does not agree. Although it is true that both Vicente-Lucas and Díaz–Bermúdez were handcuffed at the time Officer Dávila-Barrios recovered the second firearm from their vehicle, they were nonetheless standing in close proximity to it (about two or three feet) and thus were arguably within reaching distance of the passenger compartment. The defendants still had not been placed inside the patrol car, had not been patted down, and were not outnumbered by the police officers. Hence, the defendants were not fully secured at the time, as was the case in Gant, where the defendant was already handcuffed and inside the patrol car at the time of the search. Furthermore, Officer Dávila-Barrios testified that at the time he arrested Vicente-Lucas and asked him whether there were any additional firearms in the car, he still did not know whether there were any more occupants inside the back of the vehicle, due to the excessive tints on the windows.

The principles that underpinned the decision in Gant, namely officer safety and evidentiary concerns, motivate this holding. Officer Dávila-Barrios testified that he ordered Vicente-Lucas to step out of the vehicle for his (Dávila-Barrios') security, because he did not know whether there was anybody in the backseat, and because he thought it was not common for someone to be carrying such a long firearm in the manner carried by Vicente-Lucas, underneath the seat, loaded and partly visible. After arresting Vicente-Lucas and learning that he had a second firearm in the vehicle, Officer Dávila-Barrios proceeded to seize it as a safety precaution. The Court believes this course of action to be reasonable under the totality of the circumstances. Whether a search is reasonable "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, at 118-19 (internal quotation marks omitted).

In this case, both defendants were under arrest, not fully secured, and had a diminished expectation of privacy as to their persons and the vehicle. See Preston v. U.S., 376 U.S. 364, 366-67 (1964) (Although the expectation of privacy in an automobile is not as great as that in a home, an automobile is entitled to limited Fourth Amendment protection). The government's interest, on the other hand, was substantial. The police intervention was carried out at night, on a crowded highway being transited by vehicles traveling at speeds in excess of 65 miles per hour, and close to the Salinas exit. Moreover, the first weapon seized was a loaded Carbon-15 Pistol Caliber 5.56 NATO, which can handle the same bullet types as an AR-15, meaning a reasonable officer in like circumstances would regard the arrestees in this case as armed and highly dangerous. It was thus not unreasonable for the officers to seek to secure any other firearms in the vehicle before submitting Vicente-Lucas' weapons permit to closer scrutiny. See e.g. United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (if an officer "has some articulable,

reasonable suspicion that the persons stopped may be dangerous, he can pat them down and search the car's interior—including closed compartments—for weapons that they could quickly lay their hands on … but the scope of the search must be limited to this protective purpose")(quoting Michigan v. Long, 463 U.S. 1032, 1037, 1049-50 (1983). The Court has no reason to doubt that Officer Dávila-Barrios actions in searching the vehicle were limited to the protective purpose of securing a potentially dangerous firearm.

As to the second exception of the search-incident-to-arrest doctrine, the evidentiary preservation component, Vicente-Lucas argues that the officers misunderstood the law as it pertained to his authority to carry weapons under his weapons permit. He claims that the officers' belief that there was probable cause or reasonable suspicion to search his vehicle for evidence pertaining to the crime of his arrest was objectively unreasonable, as the officers failed to understand that he was authorized to carry those weapons pursuant to his permit. Vicente-Lucas' argument fails, however, as the first weapon that was seized was clearly being transported in violation of the Arms Act. As the First Circuit has stated in United States v. Polanco, 634 F.3d 39, 43 (1st Cir. 2011), officers need only a reasonable basis to carry out a search under the evidentiary preservation component of Gant. Here, after being told by Vicente-Lucas that there was a second firearm in the car, any reasonable officer in like circumstances could have reasonably suspected that the vehicle contained weapons being transported in violation of the Arms Act.

For these reasons, the search conducted by the officers was justified under the search-incident-to-arrest doctrine.

    **ii.   The Automobile Exception**

Generally, the Fourth Amendment does not require that police obtain a warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity. Ross, supra at 808-09; United States v. Bucci, 582 F.3d 108, 117-18 (1st Cir. 2009). This exception to the warrant requirement—the "automobile

exception"—stems from both the inherent mobility of vehicles and the reduced expectation of privacy that results from their pervasive regulation. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). Even if a vehicle's mobility is temporarily restricted or potential drivers have been secured, warrantless vehicle searches supported by probable cause are generally valid. Id.

The First Circuit has noted that the auto exception is distinct from the evidence-preservation component of Gant's search incident to arrest analysis, in that the auto exception extends beyond the crime of arrest. Polanco, supra at 42-43. The evidence preservation component of the Gant search incident to arrest analysis, on its part, does not extend to evidence of other offenses, and only requires a "reasonable basis". Id. The auto exception, of course, requires probable cause, focused on what the agents knew at the time they searched the car. United States v. López, 380 F.3d 538, 543 (1st Cir. 2004)(internal quotations and citations omitted).

Considering the totality of circumstances present in this case, the Court believes that the officers had probable cause to search Vicente-Lucas' vehicle for weapons that were possibly being transported in violation of the Puerto Rico Arms Act. First of all, defendants were travelling in a suspicious manner, riding at 38 mph on a 65 mph marked highway, and doing so on the left (or fast) lane. Second, the vehicle in question appeared to have its windows tinted to an extent that the officers could not peer into the vehicle to see its occupants. As soon as the officers flagged the vehicle down and approached it, they became aware that it contained a long weapon in plain view, partially hidden under Vicente-Lucas' seat, and which was clearly in violation of the Arms Act. At this point, the officers had probable cause to search the vehicle for weapons, and even more so after defendant Vicente-Lucas, who had already been given Miranda warnings, told officer Dávila-Barrios that there was a second weapon in the car. When officer Dávila-Barrios proceeded to secure the weapon, he found a cache of controlled substances

which are the focus of this motion to suppress. If, during a weapons search, an officer discovers contraband other than weapons, he or she need not ignore the contraband. Long, supra at 1050. Thus, as the officers had probable cause to search the vehicle under the automobile exception, for this reason alone the Court is entitled to deny defendant's motion to suppress.

### iii.   The Community Caretaking Doctrine

Lastly, the Court believes that the present search can also be justified under the community caretaking doctrine. The Supreme Court established the community caretaking doctrine in the case of Cady v. Dombrowski, supra. There, after the defendant's car struck a bridge abutment, the police arranged for the disabled car to be towed to a privately owned service station. The defendant, who identified himself as a Chicago policeman, was then arrested for drunken driving and hospitalized because of his injuries. The police, believing that Chicago policemen were required to carry their revolvers at all times and noting that no weapon had been found on defendant's person, looked for the weapon in the defendant's car but found evidence which ultimately connected defendant with a subsequently discovered murder. The Court, after holding that removal of the car to the service station was proper, upheld the search, and reasoned that the search was justified due to concern

> for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle.... Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments. Cady, supra at 447-48.

It is important to recognize that the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, supra at 441; United States v. Rodríguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991). Thus, as long as such caretaking activities are warranted "either in terms of state law or sound police procedure," they do not offend the

Case 3:11-cr-00132-PG   Document 41   Filed 11/09/11   Page 14 of 15
Crim. No. 11-0132 (PG)                                                Page 14

Fourth Amendment. Consequently, evidence which comes to light during the due execution of the caretaking function is ordinarily admissible at trial. See United States v. Lott, 870 F.2d 778, 781 (1st Cir. 1989).

If the detained vehicle is to be left on the street at the place of arrest rather than impounded, then it would appear that the vehicle may be immediately searched if there is probable cause to believe it contains a weapon. W. LaFave, Search and Seizure, § 7.4(c) (4th ed. 2004). See also United States v. Isham, 501 F.2d 989 (6th Cir. 1974) (When officer saw a box of ammunition in the defendant's vehicle he asked defendant if he had gun in the vehicle and received affirmative response; held that under Cady if police know that weapon is present in car "where it is vulnerable to possible theft and criminal use, police seizure of it as a public safety measure is "reasonable," and police are not required to post a guard while a warrant is issued).

Although the instant case is not factually identical to Cady—as the officers had still not taken custody of Vicente-Lucas's vehicle when the search to recover the second weapon was effectuated—the Court believes that some of the factors that predicated the decision in Cady are present here. The defendants had been arrested for violating the Arms Act and their vehicle was on a crowded highway. At that point, it was unclear whether the defendants would be taken to a station and whether the officers would take custody of the vehicle (which they ended up doing after finding the drugs). The Court finds it was reasonable as a community caretaking function to retrieve the second firearm from the vehicle while it was unattended. This in order to prevent third parties who might arrive on the scene during the intervention from reaching it or in case the vehicle would be left on the highway or at another location where it could be subject to theft while the officers conducted further background checks on the defendants. While one may argue that Officer Dávila-Barrios' search of the vehicle to retrieve the second weapon was carried out pursuant to the police's investigative and evidence-gathering functions, it is also true that the Officer acted out of concerns for his

own safety and that of others in conducting the search. In any event, the coexistence of investigatory and caretaking motives will not invalidate the seizure. Rodríguez-Morales, supra at 787.

### III. Conclusion

For the reasons elucidated above, the Court **DENIES** Vicente-Lucas' Motion to Suppress.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, November 9, 2011

S/ JUAN M. PEREZ-GIMENEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**